151 So.2d 800

Rayburn L. **MURPHY**

v.

**STATE.**

8 Div. 879.

Court of Appeals of Alabama.

April 2, 1963.

Smith, Johnston & Walker, Huntsville, for appellant.

MacDonald Gallion, Atty. Gen., and John C. Tyson, III, Asst. Atty. Gen., for the State.

PRICE, Presiding Judge.

The appellant was indicted for the murder of James W. (Pete) Free. He was found guilty of manslaughter and sentenced to serve ten years in the state penitentiary.

The case was tried on his plea of not guilty and not guilty by reason of insanity.

It is undisputed in the evidence that appellant killed Pete Free by shooting him with a pistol. According to the state's evidence three bullets entered deceased's body, in the upper left arm; the left arm below the elbow, and the left side of the chest.

Defendant testified deceased picked up defendant's wife, Wanda, after she got off from work at 9:00 o'clock, in the Parkway Shopping Center in Huntsville, on Monday night, December 18, 1961. Defendant followed them to West Clinton Street, pulled alongside, blinked his lights and deceased stopped. Defendant got out of his car, walked to the driver's side of deceased's automobile and told Wanda to get out of the car. She became hysterical and was screaming as she started getting out. Pete Free cursed defendant and, "He opened the door with his left hand and made a movement with his right hand to his right pocket * * * He held the door and he started getting out, and I don't know—I —well, I shot him." Defendant remembered pulling the trigger only one time. He was upset, scared and knew deceased had a pistol in his pocket because he had seen it earlier that evening. A loaded .38 Calibre derringer-type pistol was removed from deceased's right front pocket at the hospital:

The appellant argues for reversal two purported errors: First, the allowance of certain evidence in the form of testimony by defendant on cross-examination by the Special Prosecutor, Mr. Carroll, concerning a conversation between defendant and Mr. Carroll, at the latter's office prior to the homicide, as well as a letter (State's Exhibit E) from Mr. Carroll to defendant, written at a time when Mr. Carroll was representing defendant's wife concerning a proposed divorce action, and a document (State's Exhibit F) purporting to be an answer and waiver of notice of taking testimony and submission, executed by defendant in the proposed divorce action;

and second, the court erred in refusing to allow defendant to show the details of a conversation between the defendant and deceased at Turner's place some hour and a half to two hours prior to the homicide, which conversation the defendant insists was admissible as a part of the res gestae and was material in determining who was the aggressor.

We will treat these insistencies in the order in which they are argued in brief.

On his direct examination defendant testified since their marriage in 1959, he had been separated from his wife "spasmodically off and on;" that they were not divorced and had been together on Sunday before the killing talking about going back together, and were trying to get back together; that he had suspected for sometime that deceased was dating Wanda but had positive proof of such fact for about two weeks; that he had talked to Wanda about it and he had a conversation with Pete Free the afternoon before the killing in which he told Pete they were trying to get things straightened out so they could get back together and asked Pete not to see her again and Pete said he wouldn't see her anymore; that prior to his conversation with Free he had talked to Wanda about not seeing Pete that night and she promised to call and tell him not to come for her; that he wasn't sure but he thought he told her he would be there for her when she got off from work at 9:00 o'clock; that he did go to the shopping center on an errand and saw deceased's car pass by with Wanda in it. He stated that during the two weeks he had known about Pete and Wanda's association he had been upset, couldn't get it out of his mind, was unable to sleep and couldn't do his work properly.

Over objection, the defendant testified on cross-examination that he received the letter, (State's Exhibit E). The letter reads in pertinent part as follows:

"Please be advised that I represent your wife Wanda Daniels Murphy in

regard to settling your marital difficulties. It is my understanding that you have mutually agreed to end the separation by obtaining a divorce and if you wish to agree to same please see me no later than 4:00 o'clock P.M. Thursday, December 7th, otherwise I will feel free to proceed on Friday December 8, without further notice. In that there are no children nor alimony the only thing you will have to do is sign a waiver and answer giving her the right to get a divorce. I would suggest that you either see me or call me immediately upon receipt of this letter where we can complete same."

Defendant stated he went to Mr. Carroll's office in response to the letter and signed the waiver, (State's Exhibit F). He was asked if he said to Mr. Carroll at that time, "as long as I don't have to give her any money or alimony, I'll sign the divorce and be glad to get rid of her." The defendant answered "No, Sir." At this point counsel objected and moved for a mistrial. The court stated he was admitting this evidence, "only on the insanity issue, just as to the state of mind of this man," and overruled the motion for mistrial. The defendant said the only thing he remembered saying that he would like to "get it over with as soon as possible." He was asked if in response to defendant's question as to what the grounds for divorce would be, "did I, or did I not say to you, 'your wife has charged you with cruelty as of on or about October 27th or prior thereto, with assaulting and striking her and blacking her eyes'?" Defendant answered that no such statement was made, but that he did ask about the possibility of getting the grounds reduced to mental cruelty and was told by the attorney that mental cruelty was not a ground for divorce in Alabama. The following then occurred:

"Q. Didn't you and I discuss at that time and place in regard to your slapping your wife, also as to blacking her eyes?"

"A. No, sir, you didn't say anything about blacking her eyes."

"Q. Well, you have blacked her eyes, though, haven't you?"

The last question was objected to and the objection was sustained.

It is appellant's insistence that the foregoing questions by the special prosecutor, and defendant's answers thereto, as well as the contents of Exhibit E and F, are, in effect, testimony by the defendant's wife, brought into the case through the special prosecutor who had represented defendant's wife in a proposed divorce action against him prior to the homicide; that the information in the letter came directly from the defendant's wife, and the answer and waiver was not shown to have been public records on file in the register's office, but was in the exclusive possession of the wife's attorney in the divorce action. And further, that the questions and answers represented information and matters which the defendant's wife had told the special prosecutor as her attorney, and that such information was inadmissible since Mrs. Murphy had "claimed her privilege," under Title 15, Section 311, Code, not to testify as a witness against her husband.

We find no merit in this insistence. Some of the questions were not specifically objected to. There was a blanket objection made at the beginning of the cross-examination, "as to any conversation of any kind in Mr. Carroll's office." The grounds of objection, as well as the grounds stated to the introduction of Exhibits E and F, were the general grounds, "immaterial, incompetent and irrelevant." Such general grounds were not sufficient to inform the court that the basis of the objection to this evidence, as argued in brief, was that "it represented testimony wrung from the lips of the defendant's wife, who in this case had elected not to testify, even though brought into court." Moreover, much latitude is given upon cross-examination, and the defendant hav-

ing testified as to his mental condition, which he claimed was brought about by the attentions of the deceased to his wife, and having testified the parties had settled their differences and were planning to live together, the state had the right to refute and rebut such evidence by showing they were still estranged and were in the process of obtaining a divorce. Morris v. State, 234 Ala. 520, 175 So. 283.

It is our conclusion that appellant's second insistence of error is likewise without merit.

The defendant testified it was at Mr. Turner's place that his conversation with deceased took place about deceased's not seeing Wanda; that they were playing shuffleboard and Mr. Haskins asked and received defendant's permission to shoot defendant's pistol and that he went to the door, fired the gun and came back inside; that defendant had had several drinks of whiskey and deceased was drinking; that there was no argument or fight between himself and deceased at Turner's.

Mr. Turner testified the deceased and defendant were at his bowling alley at 7:00 or 7:15 and played two or three games together, then went outside and sat in an automobile for 15 or 20 minutes and came back inside; that after Haskins fired the gun defendant left and Pete Free told witness defendant had said to him that he would appreciate it if he wouldn't go with his wife anymore, and witness said he thought that was not too much for defendant to ask of him, but deceased said he had a date to take her home at 9:00, and he was going to take her home, but he didn't say anything about that to defendant.

Mr. Haskins testified he was at Mr. Turner's store that afternoon and saw the deceased and defendant there; that they seemed to be congenial; that he asked defendant for his pistol, in deceased's presence, fired it and returned it to defendant; that a couple of weeks before the shooting defendant's personality underwent a com-

plete change. He seemed moody and depressed and witness had had conversations with deceased concerning his attentions to defendant's wife; that on one occasion he said to deceased: "I'm not afraid. I have the difference," and took a .22 Calibre pistol from his right-hand pocket and showed it to witness.

The general rule is that acts or declarations are admissible as part of the res gestae if they are "substantially contemporaneous with the main fact under consideration, and so closely connected with it as to illustrate its character." Dudley v. State, 185 Ala. 27, 64 So. 309; Roan v. State, 225 Ala. 428, 143 So. 454; Brown v. State, 249 Ala. 5, 31 So.2d 681.

In Bessierre v. Ala. City G. & A. R. R. Co., 179 Ala. 317, 60 So. 82, it is said:

> " 'What lapse of time is embraced in the word "contemporaneous" is often a question of difficulty. Perfect coincidence of time between the declaration and the main fact is not, of course, required. It is enough that the two are substantially contemporaneous. They need not be literally so. The declaration must, however, be so proximate in point of time as to grow out of, elucidate, and explain the character and quality of the main fact, and must be so closely connected with it as to virtually constitute but one entire transaction, and to receive support and credit from the principal act sought to be thus elucidated and explained. The evidence offered must not have the earmarks of a device, or afterthought, nor be merely narrative of a transaction which is really and substantially past.' "

We think the rule of res gestae could not properly be applied to the occurrences at Mr. Turner's place, however, the able trial judge out of an abundance of caution, permitted the details of everything that transpired at Turner's to be brought out, except that he sustained the

**64**

state's objection to defendant's statement on direct examination that in his conversation with deceased at Turner's store when he asked him not to see his wife again, he said: "Pete, I know you don't think its right, because you shot at a man—," and again on redirect examination, while giving the details of his conversation with Free at Turner's place, he said: "Well, sir, I asked him not to go with my wife anymore. I told him we were trying to get things straightened out and go back together, which we had, and he agreed to it, and I said, I know you don't think it's right—," at this point the state interposed objection, which was sustained. It is these rulings by the court of which complaint is made in brief.

The statements which defendant claimed he made to Free about his having shot at someone at an earlier date, and whether Free thought it right for him to date Wanda Murphy, were not relevant to, nor did they explain and illustrate the facts of the transaction in issue.

Moreover, at one point in his examination the following occurred: By the defendant: "I was talking to him about him shooting in that car * * *." Objection was sustained, and this question was asked: "Q. What did he say?" The defendant answered: "He just pulled his pistol out there and showed it to me and said, 'Don't get mixed up in anything you can't handle.'"

It is evident that this was the testimony the defendant was seeking to bring out and that he was not deprived of any benefit to which he was entitled by sustaining of the objections to his volunteered statements.

We think the objections were properly sustained. We have carefully searched the record and find no reversible error. The judgment is due to be and hereby is affirmed.

Affirmed.